**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| SOVERAIN IP, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>EPISERVER, INC. AND EPISERVER AB<br><br>*Defendants.* | Civil Action No._____<br><br><br>JURY TRIAL DEMANDED |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Soverain IP, LLC ("Soverain" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent Nos.: 7,191,447 ("the '447 patent"); 8,606,900 ("the '900 patent"); and 8,935,706 ("the '706 patent") (collectively, the "patents-in-suit" or the "Soverain Patents").  Defendants Episerver, Inc. and Episerver AB (collectively, "Episerver" or "Defendant") infringes each of the patents-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*

### INTRODUCTION

1.      This case arises from Episerver's infringement of Soverain's data extraction and network management patent portfolio.  Soverain is the owner by assignment and exclusive licensee to twenty-four issued United States patents, multiple pending patent applications,[1] and numerous foreign patent assets.[2]

2.      The patents asserted in this case arose from the innovative work of Open Market, Inc. ("Open Market"), an innovative tech firm that in 1993 developed groundbreaking technologies for the then-nascent Internet.  Open Market was founded at a time when conducting

---

[1] *See* U.S. Patent App. Nos. 11/300,245; 11/971,361; 12/109,443; 14/047,547.

[2] *See e.g.*, JP 4485548, JP 3762882B2, EP 0803105B1, DE 69633564T2.

commercial transactions over the Internet was in its beginning stages.  Previous uses of the Internet had largely been limited to academic research and military defense work.

3.     Professor David K. Gifford of the Massachusetts Institute of Technology, co-founder of Open Market, and inventor of fourteen of the Soverain patents, recognized the potential of enabling secure transactions over computer networks.  Professor Gifford and other Open Market employees raced against other companies to bring one of the first secure transaction management systems to market.  With the technology developed, Open Market filed for the patents that would comprise the two Soverain Patent Portfolios.

4.     Open Market's groundbreaking inventions led to the issuance of patents that comprise two technology portfolios: (1) the virtual shopping cart portfolio and (2) the network management and data extraction portfolio.  The below diagram shows Soverain's patents, pending patent applications, and the Soverain patents Episerver infringes.



### SOVERAIN'S LANDMARK DATA EXTRACTION AND NETWORK TECHNOLOGIES

5.      Open Market's flagship Internet transaction product, the Open Market Transact system ("Transact") offered a full suite of software technologies, including content management, authorization protocols, and customer relationship management.  Transact contained functionality for separating the management of transactions from the management of content, allowing companies to securely and centrally manage transactions using content located on multiple distributed Web servers.

6.      In 1995, Open Market began commercial shipment of Transact.[3]  Transact was quickly embraced by the market, and its early customers included: Novell,[4] Sprint,[5] Disney,[6] AT&T,[7] and Hewlett-Packard.[8]  In March of 1996, the New York Times described Open Market's transaction management products as being adopted by Time Warner, Banc One, and First Union.

> Open Market will be competing with Netscape's I-Store and Merchant Server of
> Microsoft. Besides Time Warner, Open Market has signed several big customers

---

[3] Ellis Booker, *Internet Security Boosted,* COMPUTERWORLD at 14 (April 17, 1995) ("Last month, Open Market became the first vendor to release a Web server that supports both SHTTP and SSL.").

[4] Jessica Davis, *Novell, Open Market Ink Deal*, INFOWORLD at 6 (March 25, 1996) ("Novell has licensed OM-SecureLink commerce server software for the Internet, and plans to integrate OM-SecureLink with Novell's Web server by the third quarter.").

[5] *Sprint Chooses Open Market's Transact as Key Offering of its E-Commerce Services*, PRESS RELEASE (September 27, 2000) ("Sprint will host Transact and offer its functionality as a service for these enterprise sites.").

[6] Eric Nee, *Surf's Up*, FORBES ONLINE (July 27, 1998), available at: https://www.forbes.com/forbes/1998/0727/6202106a.html ("Today Open Market is a leading supplier of Internet commerce software.  More than 1,000 Web sites use Open Market software to transact business.  Its clients include Disney, which sells on the Internet everything you can buy in one of its shopping mall stores, and Analog Devices, which allows engineers to find and order examples of integrated circuits on its Web site.").

[7] Jeff Symoens, *Transact 3.0: Scalable Solution*, INFOWORLD at 68 (September 8, 1997) ("AT&T is using Transact as part of SecureBuy, a service that gives merchants the infrastructure to run an electronic store on the internet.").

[8] *HP And Open Market Offer Mission-Critical E-Commerce Services*, HP OPEN MARKET PRESS RELEASE (November 18, 1998) ("Open Market is the first member of HP`s Domain Commerce alliance program to integrate HP`s MC/ServiceGuard with its products.").

including Banc One, First Union Bank, Hewlett-Packard, Digital Equipment and Bloomberg, the financial publisher. Time Warner has been offering electronic versions of Time, People, Sports Illustrated, Money and other publications free on its Pathfinder Web site.[9]

7.      By the late 1990s, Transact was an established market leader in e-commerce technology, commanding dominant market share of the transactional software market against companies like Microsoft and IBM.[10]

8.      The following collection of news articles shows some of the headlines that Open Market's Transact product garnered in the computer industry press from 1996 to 2000.



Sandy Reed, *First-Ever Review of I-commerce System Right For New Section Debut*, INFOWORLD at 73 (September 8, 1997); Matthew Nelson, *Open Market adds Object Support to I-commerce Product*, INFOWORLD at 58 (February 16, 1998.); Ellen Messmer, *Open Market to*

---

[9] Glenn Rifkin, *Open Market Hopes It'll be Next Netscape*, N.Y. TIMES (March 4, 1996).

[10] Eric Nee, *Surf's Up*, FORBES ONLINE (July 27, 1998); *3 Big New Customers for Open Market, Inc.*, N.Y. TIMES (April 24, 1995) ("Open Market Inc. will announce today that three major media companies will use its software and services to provide content and conduct business on the Internet. A privately held company based in Cambridge, Mass., Open Market said it had signed agreements to provide technology to the Tribune Company, Advance Publications and the Time Inc. unit of Time Warner.").

*Liven Up Web-Based Publishing*, NETWORK WORLD at 16 (November 9, 1998); Mitch Wagner, *Open market Upgrade Will Support Big Business On 'Net*, COMPUTERWORLD at 8 (December 9, 1996); Ellen Messmer, *Open Market to Debut e-Comm Tools*, NETWORK WORLD at 12 (March 27, 2000); Kim Nash, *Open Market Aids Web Site Upkeep*, COMPUTERWORLD at 12 (March 11, 1996).

9.      The inventors of the Soverain Patents include Open Market's founders and engineers.  The inventors of the Soverain Patents comprise:

10.      <u>Professor David K. Gifford</u> is a professor of electrical engineering and computer science at the Massachusetts Institute of Technology ("MIT") and co-founder of Open Market. Mr. Gifford has been a member of the MIT faculty since 1982 and leads the Programming Systems Research Group at the MIT Laboratory for Computer Science.  Professor Gifford is a named inventor on fourteen of Soverain's issued patents.[11]

11.      Professor Gifford is the author of over one hundred journal articles and his research areas focus on programming language development; information discovery, retrieval, and distribution; and computation using biological substrates.  Professor Gifford earned his S.B. in 1976 from MIT and his M.S. and Ph.D. in electrical engineering from Stanford.

12.      Professor Gifford was elected as a fellow by the Association for Computing Machinery, for "contributions to distributed systems, e-commerce and content distribution."[12]

13.      <u>Dr. Lawrence Stewart</u> was Open Market's Chief Technology Officer.  Dr. Stewart is the co-inventor of nine of Soverain's patents.[13]  Dr. Stewart previously held positions at Xerox Palo Alto Research Center ("PARC") and Digital Equipment Corporation.  Recently, when writing about his role as a co-inventor of Soverain's patents, Dr. Stewart described the intellectual effort behind the inventions.

The relevant source code of the Open Marketplace system as of October 1994 was included with the patent application for anyone to read – over 50 printed pages of

---

[11] *See* U.S. Patent Nos. 4,845,658; 5,812,776; 5,724,424; 6,279,112; 6,205,437; 6,195,649; 6,199,051; 6,049,785; 7,191,447; 7,124,092; 7,448,040; 8,935,706; 8,554,591; and 8,286,185.

[12] *Gifford Named ACM Fellow*, MIT COMPUTER SCIENCE AND ARTIFICIAL INTELLIGENCE LABORATORY NEWS (December 13, 2011), available at: https://www.csail.mit.edu/node/1651.

[13] *See* U.S. Patent Nos. 7,272,639; 6,449,599; 8,635,327; 8,606,900; 8,554,591; 5,715,314; 5,708,780; 5,909,492; and 7,668,782.

code.  In other words, ***Open Market showed that these inventions weren't just a theory but an actual working system.***  Open Market submitted the source code to the Patent Office on microfiche since there was no way to submit machine readable appendices back in 1994.[14]

Dr. Stewart received an S.B. in Electrical Engineering from MIT in 1976, followed by M.S. and Ph.D. degrees from Stanford University in 1977 and 1981, respectively.  Dr. Stewart is also the author (with fellow Soverain patent inventor Winfield Treese) of the computer science textbook, *Designing Systems for Internet Commerce* (Addison-Wesley, 2002).

14.     Dr. John R. Ellis was Open Market's Architect and Technical Lead.  Dr. Ellis subsequently was the Senior Vice President of Engineering at AltaVista Internet and has held positions at Xerox PARC and Amazon.com.  Dr. Ellis is a named inventor of four Soverain patents.[15]  Dr. Ellis holds a Ph.D. from Yale University and BSE from Princeton University.

15.     Dr. Daniel Earl Geer, Jr. served as Director of, Engineering at Open Market and named inventor of two Soverain Patents.[16]  Dr. Geer was the former President of USENIX, the advanced computing systems association and served as Chief Scientist at Verdasys, Inc. and Digital Guardian, Inc. Dr. Geer holds degrees from Harvard University and MIT.

16.     Winfield Treese was previously the Associate Director of the Hariri Institute for Computing at Boston University.  Mr. Treese served as Open Market's Vice President of Technology where he was responsible for the security architecture of Open Market's products. Mr. Treese is a named inventor of eight Soverain patents.[17]  Mr. Treese was the chair of the Transport Layer Security (TLS) Working Group of the Internet Engineering Task Force (IETF), the Internet standard successor to SSL.  Mr. Treese also chaired the 8th USENIX Security

---

[14] Lawrence Steward, *The CAFC Got It Wrong In Soverain v. Newegg*, IPWATCHDOG.COM WEBSITE (December 30, 2013), available at: http://www.ipwatchdog.com/2013/12/30/the-cafc-got-it-wrong/id=47141/ (emphasis added).

[15] *See* U.S. Patent Nos. 7,448,040; 8,935,706; 8,286,185; and 7,191,447.

[16] *See* U.S. Patent Nos. 6,490,358 and 6,212,634.

[17] *See* U.S. Patent Nos. 7,448,040; 8,935,706; 8,286,185; 5,708,780; 7,272,639; 8,635,327; 8,606,900; and 7,191,447.

Symposium.  Mr. Treese is the co-author of the book *Designing Systems for Internet Commerce* (Addison-Wesley, 2002).

### SOVERAIN'S TRANSACT SYSTEM

17.    From 1996 through 2000, Open Market's product, Transact, was a leader in the e-commerce field, holding the majority of the global market for transaction management systems.[18]  When the first Soverain patents issued in 1998, Open Market was hailed for its "secure, robust, distributed architecture."  Jeff Symoens, *Transact 3.0: Scalable Solution*, INFOWORLD at 63 (September 8, 1998).  Gary Eichorn, chief executive officer of Open Market, stated that Open Market was selling its "transaction engine to telecommunications companies, banks and Internet service providers.  They're then offering commerce services to smaller companies."  HOTSEAT: GARY EICHORN, CEO OF OPEN MARKET, DESCRIBES HOW TRANSACTIONS WILL HIT THE WEB, InfoWorld at 47 (March 17, 1997).

18.    Transact provided an end-to-end solution for secure transaction management over the Internet.  Transact included the following components: (1) a transaction server for managing orders, (2) a subscription server for security and authentication by managing access to digital content, (3) a log server for secure management of log entries, and (4) a settlement server for managing the authorization of transactions.  A review of Transact in InfoWorld magazine stated "if you're comfortable with Transact's $125,000 opening price tag, it offers an exceptional architecture and a strong feature set that will handle back-end transaction processing."  Jeff Symoens, *Transact 3.0: Scalable Solution*, INFOWORLD at 63 (September 8, 1998).

19.    The following images of Soverain's Transact product show: (1) FastCGI configuration screen for keeping application processes running between requests (unlike CGI the system did not require extra overhead by requiring the system start a new process and initializing an application each time a request is made on the system); (2) a server status screen for

---

[18] *Investors Bid Up Internet Stock*, N.Y. TIMES (May 24, 1996) (In May 1996, Open Market made an initial public offering valuing the company at $1.2 billion.).

monitoring the status of multiple hosts running Transact; (3) a maintenance screen for managing system maintenance; and (4) an account validation service setting screen for managing transaction security and authentication.



A COLLECTION OF IMAGES OF THE OPEN MARKET TRANSACTION SYSTEM (the numbered annotations correspond to the (1) FastCGI settings, (2) server status screen, (3) Transact maintenance settings, and (4) account validation settings).

20. As the 2000s approached, larger technology companies entered the transaction management field; the dot-com bubble then burst.[19]  As a result, Open Market went through a restructuring and was purchased by Divine interVentures, Inc. ("Divine") for approximately $70 million in 2001.[20]  As a result of the purchase, Divine acquired Open Market's patent portfolio and its Transact software product.

---

[19] *See* Editorial, *The Dot-Com Bubble Bursts,* N.Y. TIMES, Dec. 24, 2000, at WK8 (describing the aftermath of the dot-com bubble bursting).

[20] *Divine to Buy Open Market*, NETWORK WORLD at 8 (August 20, 2001) ("Professional services and software company Divine last week agree to buy struggling Open Market in a stock deal work about $59 million.").

21.     Divine was a venture capital investment company founded in May 1999.  Divine focused on "professional services, Web-based technology, and managed services."  *Id.*  At its peak, Divine employed approximately 3,000 people in more than 20 locations worldwide and offered approximately 50 software products.

22.     In 2003, Transact was acquired by Soverain Software.  Soverain Software also acquired the patents from the original Open Market inventors and innovators.



Jeff Symoens, *Transact 3.0: Scalable Solution*, INFOWORLD at 63 (September 8, 1998) ("Transact 3.0 is a comprehensive, high-end solution for processing Internet-commerce transactions.  Pros: Secure, robust, distributed architecture.").

### SOVERAIN'S PATENT PORTFOLIO

23.     Soverain's patents and published patent applications have been cited in over 6,000 issued United States patents and published patent applications as prior art before the United

States Patent and Trademark Office.[21]   Companies whose patents and patent applications cite the Soverain patents include: Microsoft Corporation, Oracle Corporation, Facebook, Inc., AT&T, Inc., International Business Machines Corporation, Dell, Inc., etc.

24.     It is difficult today to recall a time before Soverain's patented technology had become part of the platform used to operate many websites.  But prior to the mid to late 1990's, when the applications leading to the patents in suit were filed, nothing like the patented functionality had been devised, let alone implemented. The simplicity and intuitive features of the patented technology soon became apparent.  Almost overnight, companies abandoned older technologies that often required customers to dial in directly to specific sites, shop for products using function codes or other keypad commands, and fax or phone in orders rather than complete transactions online.

---

[21] The over 6,000 forward citations to the Soverain Patents do not include patent applications that were abandoned prior to publication in the face of the Soverain Patents.

SOVERAIN COMPLAINT FOR PATENT INFRINGEMENT



The above images show major Internet properties contemporaneous (and later) to the inventions conceived in the Soverain patents, including: (1) Microsoft.com (August 1995), (2) Amazon.com (July 1995), and (3) Apple.com (July 1997).

25.     The Soverain network management and data extraction patent portfolio includes technology that allows companies to streamline and secure the single sign-on process, extract data from hosts over a network, and authenticate and encrypt data using asymmetric keys.

26.     Soverain has maintained and developed the Open Market patent portfolio, which now consists of over 50 issued and pending U.S. and international patents covering key aspects of e-commerce technology.



Nick Wingfield, *Three Patents Lift Open Market as Observers Guess Their Worth*, WALL ST. J., Mar. 4, 1998 (reporting that one analyst stated: "The most important thing is that it will allow them to be acknowledged as a leader and be sought after for strategic relationships"); Matthew Nelson and Dylan Tweney, *Open Market Wins Three I-Commerce Patents*, INFOWORLD at 10 (March 9, 1998).

27.     Confirming the value of Soverain patents, licensees have paid millions of dollars

for a license to practice the technology taught in the Soverain patents.  For example,

Amazon.com, Inc. paid 40,000,000 dollars to license the Soverain patents.[22]

### THE PARTIES

### SOVERAIN IP, LLC

28.     McKinney, Texas based Soverain owns the intellectual property rights to

information management solutions that allow companies and individuals to manage Internet

content, encrypt network based information, and manage access to network based information.

---

[22] Thom Weidlich, *Amazon.Com Set to Pay on Patents*, THE SEATTLE TIMES (August 12, 2005) ("Amazon.com, the world's largest Internet retailer, agreed to pay $40 million to Soverain Software to settle two lawsuits over patents related to online shopping.").

29.     Soverain's principal place of business is located at 6851 Virginia Parkway, Suite 214, McKinney, Texas 75071.  Like Defendant Episerver, Soverain relies on its intellectual property for its financial viability.[23]

30.     Episerver's sale and distribution of products and services that infringe the patents-in-suit has caused and continues to cause injury to Soverain.

**EPISERVER, INC. AND EPISERVER AB**

31.     Episerver, Inc. (formerly known as Ektron, Inc.) is a Delaware corporation located at 542 Amherst Street, Nashua, NH 03063.  Episerver, Inc. may be served via its registered agent The Corporation Trust Company located at Corporation Trust Center, 1209 Orange St, Wilmington, DE 19801.

32.     Episerver AB, a Swedish corporation located at Regeringsgatan 67; Box 7007; 10386 Stockholm, Sweden.

33.     On information and belief, Episerver has conducted marketing events in the state of Texas.  *See Episerver Partner Insight Exchange- Dallas*, EPISERVER WEBSITE, available at: http://www.episerver.com/learn/events/event-listing/partner-insight-exchange--dallas/ (last visited March 2016) (describing Episerver event held in Dallas, Texas in December 2016).[24]

34.     On information and belief, Episerver is registered to do business in the state of Texas.

---

[23] EPISERVER GENERAL TERMS AND CONDITIONS FOR EPISERVER MANAGED SERVICES at 2 (April 15, 2015) ("EPiServer shall have sole and exclusive ownership of all . . . copyright, trademark, patent, trade secret, know-how and other intellectual property rights pertaining thereto, subject solely to the limited right and Services expressly granted to Customer herein.  Software, owned by EPiServer, is protected by Swedish, United States and international copyright and intellectual property legislations.").

[24] *See also Episerver North America: Customer and Partner Roadshow,* EPISERVER WEBSITE, available at: http://www.episerver.com/learn/events/event-archive/2015/north-america-customer-and-partner-roadshow/ (describing a May 2015 event in Houston, Texas); *Episerver Partner Insight Exchange – Plano*, EPISERVER WEBSITE, available at: http://www.episerver.com/learn/events/event-listing/partner-insight-exchange---plano/ (last visited March 2016) (describing an Episerver event held in Plano, Texas in December 2016).

35.     On information and belief, Episerver has partnered with companies with a Texas presence including Valtech (Plano, Texas)[25] and RightPoint (Dallas, Texas),[26]

36.     On information and belief, Episerver has provided solutions to Texas based companies and organizations.[27]

### JURISDICTION AND VENUE

37.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

38.     Upon information and belief, this Court has personal jurisdiction over Episerver in this action because Episerver has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Episerver would not offend traditional notions of fair play and substantial justice.  Defendant Episerver, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), has committed and continues to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the patents-in-suit.  Moreover, Episerver is registered to do business in the State of Texas and actively directs its activities to customers located in the State of Texas.

39.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(d) and 1400(b). Defendant Episerver is registered to do business in the State of Texas and upon information and

---

[25] *Episerver Partners: Valtech*, EPISERVER WEBSITE, available at: http://www.episerver.com/partners/solution-partners/find/United-States-of-America/Valtech-Technologies-Inc/ (last visited March 2016).

[26] *Episerver Partners: RightPoint*, EPISERVER WEBSITE, available at: http://www.episerver.com/partners/solution-partners/find/United-States-of-America/rightpoint/

[27] *See e.g., State of Texas Chooses Ektron to Power Web Site Dedicated to Promoting the Well-Being of its Citizens*, EKTRON PRESS RELEASE (June 3, 2009) ("Ektron's team of healthcare advisors and developers will be leading the Texas DSHS Web project from the discovery phase through implementation."); *Alamo College Career Pathfinder*, EPISERVER CASE STUDY, available at: http://www.episerver.com/solutions/our-customers/by-industry/alamo-college-career-pathfinder/ (last visited March 2016).

belief, has transacted business in the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas.

## TECHNOLOGY BACKGROUND

### U.S. PATENT NO. 7,191,447

40.     U.S. Patent No. 7,191,447 ("the '447 patent") entitled, *Managing Transfer of Information in a Communications Network*, was filed on August 25, 2000, and claims priority to October 25, 1995.  The '447 patent is subject to a 35 U.S.C. § 154(b) term extension of 615 days. Soverain is the owner by assignment of the '447 patent.  A true and correct copy of the '447 patent is attached hereto as Exhibit A.  The '447 patent claims specific methods and systems for managing transfers of information in communications networks such as the World Wide Web.

41.     All the claims in the '447 patent were subject to *inter partes* reexamination before the United States Patent Office.  The reexamination certificate confirming all claims was issued on October 5, 2012.  In addition to confirming the patentability of all claims of the '447 patent, 83 additional claims were added and determined to be patentable over multiple references that were not cited during the prosecution of the '447 patent.

42.     During the reexamination proceeding, the United States Patent and Trademark Office Board of Patent Appeals and Interferences confirmed the patentability of the claims over four references.[28]

---

[28] *Decision of the United States Patent and Trademark Office Board of Appeals and Interferences*, INTER PARTES REEXAMINATION CONTROL NO. 95/000,505 (January 26, 2012).



Reexam Ctrl. No. 95/000,505, '447 Patent, Cert. Issued, October 5, 2012.

43.    The '447 patent teaches various techniques for managing transfers of information in public packet switched communications networks.  For example, the '447 patent teaches a system where a server receives data from one or more networked servers and merges the data into one or more master logs.  The '447 patent also teaches a system for implementing security protocols wherein a proxy server translates links between an incompatible network protocol to a compatible network protocol and then back-translates the link.  The '447 patent also discloses a system for extracting data from sources of network-based information in a communication network using an object embedding program that locates a script program and causes the script program to extract data and make it available over a computer network.

44.    The '447 patent and its underlying application, foreign counterparts, and its related patents have been cited by 135 United States patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '447 patent family as relevant prior art:

- International Business Machines Corporation
- Telefonaktiebolaget L M Ericsson
- Alcatel-Lucent USA, Inc.
- Juniper Networks, Inc.
- Yellowpages.Com LLC
- General Electric Company

- Microsoft Corporation
- Kaspersky Lab Zao
- Lucent Technologies, Inc.
- AOL, Inc.
- Facebook, Inc.
- Siemens Aktiengesellschaft
- Fujitsu Limited
- Vodafone Group plc
- Charles Schwab & Co., Inc.
- Salesforce.com, Inc.
- Samsung Electronics Co., Ltd.
- Amazon.com, Inc.

**U.S. PATENT NO. 8,606,900**

U.S. Patent No. 8,606,900 ("the '900 patent") entitled, *Method and System for Counting Web Access Requests*, was filed on April 12, 2000, and issued on December 10, 2013.  The '900 patent is subject to a 35 U.S.C. § 154(b) term extension of 1,645 days. Soverain is the owner by assignment of the '900 patent.  A true and correct copy of the '900 patent is attached hereto as Exhibit B.  The '900 patent claims specific methods and systems for processing service requests from a client to a server through a network.  In particular, the '900 patent teaches methods and systems applicable to processing client requests in an HTTP (Hypertext Transfer Protocol) environment.

45.     The '900 patent teaches the processing of service requests from a client to a server through a computer network.  Specifically, the '900 patent describes forwarding a service request from the client to the server and appending a session identification to the request and to subsequent service requests from the client to the server within a session.  A session identifier may include an authorization identifier to allow a user to access controlled files.

46.     The '900 patent and its related patents have been cited by 139 United States patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '900 patent family as relevant prior art:

- Sprint Communications Company L.P.
- Qualcomm, Inc.

- Netscape Communications Corporation[29]
- SAP AG
- Facebook, Inc.
- AOL, Inc.
- Fuji Xerox Co., Ltd.
- About, Inc.
- Bellsouth Intellectual Property Corporation
- AT&T, Inc.
- Citrix Systems, Inc.
- International Business Machines Corporation
- Nokia Corporation
- Yahoo! Inc.
- Dell, Inc.
- Microsoft Corporation
- Paramount Pictures Corporation
- Cisco Systems, Inc.
- McAfee, Inc.

## U.S. PATENT NO. 8,935,706

47.     U.S. Patent No. 8,935,706 ("the '706 patent") entitled, *Managing Transfers of Information in a Communications Network,* was filed on September 29, 2008, and issued on January 13, 2015.  The '706 patent is subject to a 35 U.S.C. § 154(b) term extension of 524 days. Soverain is the owner by assignment of the '706 patent.  A true and correct copy of the '706 patent is attached hereto as Exhibit C.  The '706 patent claims specific methods and systems for implementing security protocols over a network.  The patent teaches the use of server to translate links from a protocol incompatible with an Internet browser to a protocol that is compatible with the same browser.  The patent also teaches systems and methods for managing the authentication credentials of a user over a computer network.

48.     The '706 patent teaches a system for managing authentication credentials on a public packet switched communications network that includes network servers that receive requests for data that is then transmitted to the requesting party.  In one example, a proxy server, maintains a table of authenticating credentials for each network server.  The proxy server

---

[29] Netscape Communications Corporation was originally founded under the name Mosaic Communications Corporation and was one of the early developers of web browsing technology. It was subsequently purchased by AOL, Inc.

receives a request for authentication from a network server, retrieves authentication credentials from the table, and transmits the authenticating credentials to the network server.  The network server upon receiving the credentials forwards the requested data to the requesting computer.

49.     The '706 patent teaches the managing of user authentication credentials using a proxy server.  The '706 patent is directed at solving a problem unique to computer networks – centrally managing numerous authentication credentials for computer users.  Using the same authenticating credentials for a large number of services increases the risk that a breach in security in connection with one service will affect other services.  Moreover, a user may be able to use a particular set of authenticating credentials in connection with one service but not another service, for example if one of the credentials is already being used by another user of the other service.  The invention is directed at solving issues relating to having users type in a user ID and password each time a user visits a network service.

50.     The '706 patent and its underlying application, foreign counterparts, and related domestic patents and patent applications have been cited by 135 United States patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '706 patent family as relevant prior art:

- International Business Machines Corporation
- Telefonaktiebolaget L M Ericsson
- Alcatel-Lucent USA, Inc.
- Juniper Networks, Inc.
- Yellowpages.Com LLC
- General Electric Company
- Microsoft Corporation
- Kaspersky Lab Zao
- Lucent Technologies, Inc.
- AOL, Inc.
- Facebook, Inc.
- Siemens Aktiengesellschaft
- Fujitsu Limited
- Vodafone Group plc
- Charles Schwab & Co., Inc.
- Salesforce.com, Inc.
- Samsung Electronics Co., Ltd.

- Amazon.com, Inc.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 7,191,447

51.     Soverain references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

52.     Episerver designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for extracting data from sources of network-based information.

53.     Episerver designs, makes, sells, offers to sell, imports, and/or uses the Episerver CMS (Versions 7.5, 8.0, and 9.0) and Episerver Digital Experience Cloud Service (the "Episerver '447 Product(s)").

54.     On information and belief, one or more Episerver subsidiaries and/or affiliates use the Episerver '447 Products in regular business operations.

55.     On information and belief, one or more of the Episerver '447 Products include technology for extracting data from sources of network-based information in a communications network having a plurality of network servers programmed to transmit network-based information.

56.     On information and belief, one or more of the Episerver '447 Products enable an object embedding program implemented on a computer.  The object embedding program contains functionality to locate a script program.

57.     On information and belief, the Episerver '447 Products are available to businesses and individuals throughout the United States.

58.     On information and belief, the Episerver '447 Products are provided to businesses and individuals located in the Eastern District of Texas.

59.     On information and belief, the Episerver '447 Products comprise a system containing functionality for a script program that is implemented on a computer on a communication network.

60.     On information and belief, the Episerver '447 Products contain a script program wherein the script program is structured to extract data from network-based information provided by a networked server.

61.     On information and belief, the Episerver '447 Products contain an object embedding program, implemented on computers.  The object embedding program implemented on the '447 Product comprises a link to said network-based information provided by a networked server.

62.     On information and belief, the Episerver '447 Products enable an object embedding program to (via a link) locate a script program.

63.     On information and belief, the Episerver '447 Products enable an object embedding program that is structured to apply the script program to the network-based information.  The application of the script program causes data to be extracted from a networked server.

64.     On information and belief, the Episerver '447 Products enable the embedding of data in a compound document that is on the communications network.

65.     On information and belief, the Episerver '447 Products enable the object embedding program to locate the script program via a link.  Further, the '447 Products enable the network-based information to be linked to the scripting program.

66.     On information and belief, the Episerver '447 Products comprise a system for executing an object embedding program to embed said data within a compound document implemented on a computer in said communications network.

67.     On information and belief, Episerver has directly infringed and continues to directly infringe the '447 patent by, among other things, making, using, offering for sale, and/or selling technology for extracting data from sources of network-based information, including but not limited to the Episerver '447 Products, which include infringing technology for managing transfers of information in a communications network.  Such products and/or services include, by way of example and without limitation, the Episerver '447 Products.

SOVERAIN COMPLAINT FOR PATENT INFRINGEMENT

68.     By making, using, testing, offering for sale, and/or selling products and services, including but not limited to the Episerver '447 Products, Episerver has injured Soverain and is liable to Soverain for directly infringing one or more claims of the '447 patent, including at least claim 5, pursuant to 35 U.S.C. § 271(a).

69.     On information and belief, Episerver also indirectly infringes the '447 patent by actively inducing infringement under 35 USC § 271(b).

70.     On information and belief, Episerver had knowledge of the '447 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Episerver knew of the '447 patent and knew of its infringement, including by way of this lawsuit.

71.     On information and belief, Episerver intended to induce patent infringement by third-party customers and users of the Episerver '447 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Episerver specifically intended and was aware that the normal and customary use of the accused products would infringe the '447 patent.  Episerver performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '447 patent and with the knowledge that the induced acts would constitute infringement.  For example, Episerver provides the Episerver '447 Products that have the capability of operating in a manner that infringe one or more of the claims of the '447 patent, including at least claim 5, and Episerver further provides documentation and training materials that cause customers and end users of the Episerver '447 Products to utilize the products in a manner that directly infringe one or more claims of the '447 patent.  By providing instruction and training to customers and end-users on how to use the Episerver '447 Products in a manner that directly infringes one or more claims of the '447 patent, including at least claim 5, Episerver specifically intended to induce infringement of the '447 patent.  On information and belief, Episerver engaged in such inducement to promote the sales of the Episerver '447 Products, e.g., through Episerver user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '447 patent.  Accordingly,

SOVERAIN COMPLAINT FOR PATENT INFRINGEMENT

Episerver has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '447 patent, knowing that such use constitutes infringement of the '447 patent.

72.     The '447 patent is well-known within the industry as demonstrated by the over 135 citations to the '447 patent in published patents and patent applications assigned to technology companies and academic institutions.  Several of Episerver's competitors have paid considerable licensing fees for their use of the technology claimed by the '447 patent.  In an effort to gain an advantage over Episerver's competitors by utilizing the same licensed technology without paying reasonable royalties, Episerver infringed the '447 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

73.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '447 patent.

74.     As a result of Episerver's infringement of the '447 patent, Soverain has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Episerver's infringement, but in no event less than a reasonable royalty for the use made of the invention by Episerver together with interest and costs as fixed by the Court.

### COUNT II
### INFRINGEMENT OF U.S. PATENT NO. 8,606,900

75.     Soverain references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

76.     Episerver designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for tracking web page requests received at a web server.

77.     Episerver designs, makes, sells, offers to sell, imports, and/or uses the Episerver CMS (versions 7.5, 8.0, and 9.0) (functionality includes LiveMonitor) and Episerver Digital Experience Cloud Service (functionality includes Digital Marketing Analytics and Digital Commerce Analytics) (collectively, the "Episerver '900 Product(s)").

78.     On information and belief, one or more Episerver subsidiaries and/or affiliates use the Episerver '900 Products in regular business operations.

79.     On information and belief, one or more of the Episerver '900 Products include technology for tracking webpage requests received at a web server from multiple clients.

80.     On information and belief, the Episerver '900 Products generate multiple session identifiers.  The session identifiers that are generated by the Episerver '900 Products are text strings that identify a series of requests and responses to perform a complete task or set of tasks between a client and a server system.

81.     On information and belief, the Episerver '900 Products generate session identifiers that have information associated with a particular accessing computer where the accessing computer is making a webpage request to the web server.

82.     On information and belief, the Episerver '900 Products enable the storing of the session identifiers at the accessing computer in the accessing computer's web browser.  For example, if an accessing computer is running a browser such as Microsoft Internet Explorer the session identifier is stored in the web browser.

83.     On information and belief, the Episerver '900 Products enable the receipt of web page requests at the web server.  Each web page request includes a session identifier associated with a particular client making the web page request.  Specifically, the Episerver '900 Products receive requests from accessing computers wherein the each request for a web page includes the session identifier associated with the requesting computer.

84.     On information and belief, the Episerver '900 Products enable storing data regarding the web page requests.  The data includes the webpage that is requested and the session identifiers associated with the request.  Specifically, the Episerver '900 Products keep a log of access requests wherein the log incudes the requests for specific web pages and related session identifiers.

85.     On information and belief, the Episerver '900 Products are provided to businesses and individuals located in the Eastern District of Texas.

86.    On information and belief, the Episerver '900 Products enable the tracking of webpage requests by evaluating the information stored at the web server and by counting the number of requests for particular web pages exclusive of repeated requests from a particular client utilizing information associated with a particular client.  Specifically, the Episerver '900 Products contain website analytics functionality that allows tracking the number of webpage requests that exclude multiple requests from the same computer associated with a unique session identifier.

87.    On information and belief, the Episerver '900 Products enable counting the number of requests for a webpage wherein the counting performed by the Episerver '900 Products excludes repeated requests from a particular client computer that occur within a predetermined period of time, and thereafter counts a repeated request for the same web page from the particular client.  Specifically, the Episerver'900 Products enable frequency thresholds that exclude counting access requests where the frequency exceeds a specific threshold within a set period of time.

88.    On information and belief, Episerver has directly infringed and continues to directly infringe the '900 patent by, among other things, making, using, offering for sale, and/or selling web tracking technology, including but not limited to the Episerver '900 Products, which include infringing web server tracking technologies.  Such products and/or services include, by way of example and without limitation, the Episerver '900 Products.

89.    By making, using, testing, offering for sale, and/or selling web tracking products and services, including but not limited to the Episerver '900 Products, Episerver has injured Soverain and is liable to Soverain for directly infringing one or more claims of the '900 patent, including at least claims 1 and 5, pursuant to 35 U.S.C. § 271(a).

90.    On information and belief, Episerver also indirectly infringes the '900 patent by actively inducing infringement under 35 USC § 271(b).

91.     On information and belief, Episerver had knowledge of the '900 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Episerver knew of the '900 patent and knew of its infringement, including by way of this lawsuit.

92.     On information and belief, Episerver intended to induce patent infringement by third-party customers and users of the Episerver '900 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Episerver specifically intended and was aware that the normal and customary use of the accused products would infringe the '900 patent.  Episerver performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '900 patent and with the knowledge that the induced acts would constitute infringement.  For example, Episerver provides the Episerver '900 Products that have the capability of operating in a manner that infringe one or more of the claims of the '900 patent, including at least claims 1 and 5, and Episerver further provides documentation and training materials that cause customers and end users of the Episerver '900 Products to utilize the products in a manner that directly infringe one or more claims of the '900 patent.  By providing instruction and training to customers and end-users on how to use the Episerver '900 Products in a manner that directly infringes one or more claims of the '900 patent, including at least claims 1 and 5, Episerver specifically intended to induce infringement of the '900 patent.  On information and belief, Episerver engaged in such inducement to promote the sales of the Episerver '900 Products, *e.g.*, through Episerver user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '900 patent.  Accordingly, Episerver has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '900 patent, knowing that such use constitutes infringement of the '900 patent.

93.     The '900 patent is well-known within the industry as demonstrated by the over 139 citations to the '900 patent in published patents and patent applications assigned to technology companies and academic institutions.  Several of Episerver's competitors have paid

considerable licensing fees for their use of the technology claimed by the '900 patent.  To gain an advantage over Episerver's competitors by utilizing the same licensed technology without paying reasonable royalties, Episerver infringed the '900 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

94.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '900 patent.

95.     As a result of Episerver's infringement of the '900 patent, Soverain has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Episerver's infringement, but in no event less than a reasonable royalty for the use made of the invention by Episerver together with interest and costs as fixed by the Court.

### COUNT III
### INFRINGEMENT OF U.S. PATENT NO. 8,935,706

96.     Soverain references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

97.     Episerver designs, makes, uses, sells, and/or offers for sale in the United States products and/or services for managing authentication credentials for access to data stored on servers.

98.     Episerver designs, makes, sells, offers to sell, imports, and/or uses the Episerver Digital Experience Cloud (the "Episerver '706 Product(s)").

99.     On information and belief, one or more Episerver subsidiaries and/or affiliates use the Episerver '706 Products in regular business operations.

100.    On information and belief, one or more of the Episerver '706 Products include technology for managing authentication credentials for access to data stored on a network.

101.    On information and belief, one or more of the Episerver '706 Products include functionality for receiving and storing authentication credentials for each of the plurality of

sources of network based information.  Specifically, the Episerver '706 Products enable storing access credentials that relate to specific systems that are connected via a network.

102.     On information and belief, one or more of the Episerver '706 Products enable storing authentication credentials in a table of pairs.  The table that is used by the '706 Products to store the credentials is organized so that each pair stored in the table represents a subscription service network server and corresponding credentials for the subscription service.

103.     On information and belief, one or more of the Episerver '706 Products enable forwarding access requests to a server where network based information is stored.

104.     On information and belief, one or more of the Episerver '706 Products enable receiving a request for authentication from a server where network based information is stored. The authentication request received by the Episerver '706 Products related to the access request forwarded to the server where the network based information is stored.

105.     On information and belief, one or more of the Episerver '706 Products, in response to an authentication request retrieve the stored authentication credentials that are specific to the server where the network based information is stored.

106.     On information and belief, one or more of the Episerver '706 Products retrieve the authentication credentials that are assigned to a user upon registration with the subscription service.

107.     On information and belief, one or more of the Episerver '706 Products enable associating a password with stored authentication credentials.

108.     On information and belief, one or more of the Episerver '706 Products enable receiving a password in response to a user initiating a network session with the network server.

109.     On information and belief, one or more of the Episerver '706 Products enable transmitting authentication credentials to the server where network based information is stored. The transmission of authentication credentials occurs in the Episerver '706 Products following successful verification of the user's password.

110.    On information and belief, the Episerver '706 Products are provided to businesses and individuals located in the Eastern District of Texas.

111.    On information and belief, one or more of the Episerver '706 Products enable the using the single password to authenticate a user for multiple sources of network based information (e.g., network based information stored on two different servers).

112.    On information and belief, Episerver has directly infringed and continues to directly infringe the '706 patent by, among other things, making, using, offering for sale, and/or selling technology for managing authentication credentials for access to a plurality of sources of network-based information, including but not limited to the Episerver '706 Products, which include infringing authentication credential management technologies.  Such products and/or services include, by way of example and without limitation, the Episerver '706 Products.

113.    By making, using, testing, offering for sale, and/or selling products and services for managing authentication credentials for access to a plurality of sources of network based information, including but not limited to the Episerver '706 Products, Episerver has injured Soverain and is liable to Soverain for directly infringing one or more claims of the '706 patent, including at least claims 1-5, pursuant to 35 U.S.C. § 271(a).

114.    The '706 patent is well-known within the industry as demonstrated by the over 135 citations to the '706 patent in published patents and patent applications assigned to technology companies and academic institutions.  Several of Episerver's competitors have paid considerable licensing fees for their use of the technology claimed by the '706 patent.  To gain an advantage over Episerver's competitors by utilizing the same licensed technology without paying reasonable royalties, Episerver infringed the '706 patent in a manner best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

115.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '706 patent.

116.    As a result of Episerver's infringement of the '706 patent, Soverain has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Episerver's infringement, but in no event less than a reasonable royalty for the use made of the invention by Episerver together with interest and costs as fixed by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Soverain respectfully requests that this Court enter:

A.    A judgment in favor of Plaintiff Soverain that Episerver has infringed, either literally and/or under the doctrine of equivalents, the '447 patent, the '900 patent, and the '706 patent;

B.    An award of damages resulting from Episerver's acts of infringement in accordance with 35 U.S.C. § 284;

C.    A judgment and order finding that Defendant's infringement was willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate within the meaning of 35 U.S.C. § 284 and awarding to Plaintiff enhanced damages.

D.    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Plaintiff its reasonable attorneys' fees against Defendant.

E.    Any and all other relief to which Soverain may show itself to be entitled.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Soverain IP, LLC requests a trial by jury of any issues so triable by right.

Dated:   April 12, 2017                          Respectfully submitted,


                                                 /s/  Dorian S. Berger_____
                                                 Elizabeth L. DeRieux (TX Bar No.
                                                 05770585)
                                                 D. Jeffrey Rambin (TX Bar No. 00791478)
                                                 CAPSHAW DERIEUX, LLP
                                                 114 E. Commerce Ave.
                                                 Gladewater, Texas 75647
                                                 Telephone: 903-845-5770
                                                 E-mail: ederieux@capshawlaw.com
                                                 E-mail: jrambin@capshawlaw.com


                                                 Dorian S. Berger (CA SB No. 264424)
                                                 Daniel P. Hipskind (CA SB No. 266763)
                                                 BERGER & HIPSKIND LLP
                                                 1880 Century Park East, Ste. 815
                                                 Los Angeles, CA 95047
                                                 Telephone: 323-886-3430
                                                 Facsimile: 323-978-5508
                                                 E-mail: dsb@bergerhipskind.com
                                                 E-mail: dph@bergerhipskind.com

                                                 *Attorneys for Soverain IP, LLC*